IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NEVILLE PORRAS,                        No. C 08-5252 CW (PR)

       Petitioner,              ORDER GRANTING PETITION
                                       FOR WRIT OF HABEAS CORPUS
  v.

BEN CURRY, Warden,

       Respondent.
_____/

    Petitioner Neville Porras, a state prisoner, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging as a violation of his constitutional rights the seventh denial of parole by the California Board of Parole Hearings (Board) on July 31, 2007.  Petitioner previously filed a writ of habeas corpus challenging the Board's denial of parole at his July 12, 2005 parole suitability hearing; this Court denied him relief on August 13, 2008.  See Porras v. Davis, Case No. C 06-6285 CW (PR).

    On June 22, 2009, the Court issued an Order to Show Cause why the present writ should not be granted.  On November 1, 2009, Respondent filed a motion to dismiss the petition for mootness, which the Court denied on December 29, 2009.  On March 1, 2010, Respondent filed an answer.  On March 22, 2010, Petitioner filed a traverse.

    After the matter was submitted, on April 22, 2010, the Ninth Circuit issued its decision in Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc), which addressed federal habeas review of Board decisions denying parole to California state prisoners.  On May 21, 2010, the Court ordered the parties

United States District Court
For the Northern District of California

1  to file supplemental briefing explaining how the <u>Hayward</u> en banc

2  decision applies to the facts presented in the present case.

3  Respondent filed supplemental briefing on June 17, 2010;

4  Petitioner filed his response on June 23, 2010.

5      Having considered all of the papers filed by the parties,

6  the Court GRANTS the petition and remands the matter to the

7  Board to reevaluate Petitioner's parole suitability in

8  accordance with this Order.

9      Petitioner has filed a new action with the Court.  <u>See</u>

10  <u>Porras v. Noll</u>, Case No. C 09-4936 CW (PR).  At Petitioner's

11  September 4, 2008 parole suitability hearing, the Board granted

12  him parole.  However, the governor reversed the Board's decision

13  on January 29, 2009.  Therefore, Petitioner challenges the

14  governor's reversal in his new action.

15                          BACKGROUND

16  I.   The Commitment Offense

17      Petitioner committed the offense of conviction on August

18  12, 1988, when he was nineteen years old.  The following facts

19  are derived from the California Court of Appeal's decision

20  affirming Petitioner's second-degree murder conviction on direct

21  appeal:

22          Late in the evening of August 11 and early in the
            morning of August 12, 1988, the victim, Shawn
23          Bartholomew, and his friend, Cosmo Allen Byrd, got
            drunk with some friends under Waterloo Bridge.  The
24          victim and Byrd went to Waterloo Liquors, where Byrd
            left the victim to return home.  Byrd heard someone
25          yell, "'Come here,'" as he walked away from the
            liquor store.  He turned around and saw someone who
26          resembled defendant running.  Byrd continued home.

27          During the same night, defendant was in his front
            yard drinking with his brother, Willie Lester, and
28          Lester's friend, Mike Garcia.  William "Moose"
            Phillips and Dennis "scooter" Wheeler passed in front

United States District Court
For the Northern District of California

of the house and exchanged angry words with
defendant.  Phillips and Wheeler left, but defendant
and his group armed themselves, defendant with a
butcher knife, and enlisted the aid of another
friend, James Azevedo.  The group began searching for
Phillips, but without success.  All but Lester
returned to defendant's front yard.  Shortly after
they returned, they heard yelling from the alley.
The voice sounded to them like Lester's, although
Lester denied later that it was he.

After hearing the yell, defendant left alone to
look for his brother.  Eventually, defendant saw the
victim and chased him down.  Defendant held the
victim by the hair and said, "Where's my brother,
where's my brother[?]"  Lester and Garcia arrived
after defendant caught the victim.  Lester hit the
victim with a stick, and Garcia kicked the victim in
the head.  Defendant was the only one in the group
with a knife, and he later admitted to law
enforcement he stabbed the victim.

The group left the victim and returned to
defendant's yard.  Paramedics . . . found the
bloodied victim lying in the fetal position.  The
victim died of a stab wound which pierced his heart,
liver, and right lung.

People v. Porras, No. C007818, slip op. at 3-4 (Cal. App. Ct.

July 18, 1991).

Petitioner's version, read into the record at the 2007

parole suitability hearing, differs from the above account:

Porras heard Willie L. (Porras' younger brother)
scream out.  He saw a broken knife (blade with no
handle) lying on the ground as he was running to
where the yells were coming from.  At this point,
Porras encountered the victim and the victim's
friend, Cosmo Byrd, B-Y-R-D.  Porras stated he was
looking for his brother when Cosmo Byrd threw a punch
and grazed his forehead.  Porras then states the
victim grabbed him in a bear hug and a struggle
occurred.  Porras stated that he reached for his belt
and pulled out the knife blade swinging it twice, not
knowing if contact was made.  Porras then states he
and the victim lost their footing.  Both fell down
with Porras dropping the knife.  Both Porras and the
victim got up throwing punches at each other.  The
victim lunged in and grabbed him around the waist
when both Porras and the victim fell to the ground
again.  Porras states that when the victim started to
get up, Mike G. ran up and kicked the victim in the
face and hit him several times.  Porras then stated

3

United States District Court
For the Northern District of California

> the victim started to run up the street while he ran
> toward an alley after picking up the knife blade.  He
> then threw the blade in a vacant lot.  After finding
> his brother, Porras returned to his home and had no
> idea the victim was wounded as severely as he was.
> Porras stated, "He never planned, nor had any
> intentions of hurting anybody."

(Pet. Ex. 1, July 31, 2007 Parole Consideration Hearing, at 11-13.)

II.   Conviction and Sentencing

On October 31, 1989, a San Joaquin County jury convicted Petitioner of second-degree murder.  (Cal. Penal Code § 187.) The trial court sentenced him to fifteen years to life in prison, with a consecutive one-year term for use of a knife. (Cal. Penal Code § 12022(b).)  Petitioner was received by the California Department of Corrections and Rehabilitation (CDCR) on December 1, 1989, and his life term began the same day, with 667 days of credit for time served.  On direct appeal, the state court of appeal affirmed his conviction.  His minimum parole eligibility date was set for June 5, 1999.  (Pet. at 6.)

III.  July 31, 2007 Parole Suitability Hearing

Petitioner had been incarcerated for almost twenty years at the time of the 2007 parole suitability hearing.  The Board found Petitioner was not yet suitable for parole and that he would pose an unreasonable risk of danger to society or threat to public safety if released from prison, citing an "inexplicable" motive for the crime.  (Pet. Ex. 1 at 35.)  The Board continued, "You didn't know the victim.  Whether you were sufficiently impacted by the use of alcohol is not known to us but in any event, it certainly is inexplicable for the magnitude to the loss."  (Id. at 35-36.)

As additional evidence of Petitioner's current level of danger to society, the Board cited his juvenile record, which included burglary, trespass and driving under the influence. (<u>Id.</u> at 12-13.)  The Board also noted that he had four vehicle code violations as an adult, at least two of which were for driving under the influence.  (<u>Id.</u> at 14, 36.)  He had no further adult criminal record.  (<u>Id.</u> at 14.)

The Board observed that Petitioner had no reports of violence while incarcerated.  (<u>Id.</u> at 25.)  He had five disciplinary reports, or CDC-115s.  (<u>Id.</u>)  The most recent was in 2004 for having a television in his cell.  (<u>Id.</u>)  The remaining four CDC-115s were grooming standards violations. (<u>Id.</u>)  Recognizing that Petitioner is a Native American and keeps his hair long for religious reasons, the Board disregarded the four reports "because they were all involved with grooming, they had nothing of about anything that we would consider inappropriate conduct violence or anything like that."  (<u>Id.</u> at 14, 25, 37-38.)  He also has received eight disciplinary memos, or CDC-128s, apparently for grooming violations.  (<u>Id.</u> at 26.)

The Board also noted that Petitioner "programmed in a limited manner while incarcerated," calling his programming "thin."  (<u>Id.</u> at 36.)  It recommended that Petitioner confront his problems with alcoholism, requesting that he demonstrate his ability to recognize that he was "having problems with alcohol at the time of the commitment offense" and what he "would do to use as a relapse prevention program."  (<u>Id.</u> at 37.)  Although the Board noted that Petitioner had participated in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) programming for many

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

years, it had concerns because he stopped attending the meetings after he was placed on C-status for his grooming violations. (Id. at 24, 27.)  C-status is the CDCR's classification for inmates whose conduct interferes with prison programming.  Cal. Code Regs. tit. 15, §§ 3044(b)(A), 3044(f).  Such conduct includes the failure to comply with work assignments, educational program assignments, grooming standards or other program requirements.  Id.  While the Board recognized that it could not compel him to attend AA as a condition for parole, it did expect him to do self-help relating to his problems with alcoholism.  (Id.)

The Board also considered Petitioner's failure to develop a marketable skill.  (Id. at 36-37.)  After he reported that he had not received a work assignment since 1998, when he was placed on C-status, the Board noted, "You're one of the few healthy people that's come before me that's remained unassigned for such a substantial period of time." (Id. at 22, 36.)  It pointed to Petitioner's limited vocational training while incarcerated, noting that he received his GED in 1997 and a vocational X-ray certificate in 1998 but had not done further educational or vocational activities.  (Id. at 22-23, 36-37.)

Finally, the Board noted with approval that Petitioner had secured living arrangements and an employment offer, and that the Board had received no opposition to his parole.  (Id. at 38.)  It concluded that the positive aspects of his behavior did not outweigh the factors of unsuitability.  (Id.)

IV.  State Petitions for Writ of Habeas Corpus

Petitioner unsuccessfully challenged the Board's decision

in the San Joaquin County Superior Court.  (Pet. Ex. 10, State
Superior Court Decision, at 1.)  In denying the petition, the
state superior court found that the Board's decision was
"supported by 'some evidence'" that Petitioner "poses an
unreasonable risk to society if released." (<u>Id.</u>)  Specifically,
the court held that the Board identified four factors comprising
"some evidence": the commitment offense, Petitioner's criminal
history, his "misconduct while incarcerated" and his failure to
"develop a marketable skill that can be put to use upon his
release." (<u>Id.</u>)

On June 27, 2008, Petitioner filed a petition for a writ
of habeas corpus in the state appellate court.  (Answer Ex. A,
Appellate Court Pet., at 1.)  On August 28, 2008, the court
summarily denied the petition.  (Pet. Ex. 11, Appellate Court
Decision, at 1.)

On September 8, 2008, Petitioner filed a petition for a
writ of habeas corpus in the California Supreme Court.  (Answer
Ex. B, Supreme Court Pet., at 1.)  On October 22, 2008, the
state supreme court summarily denied the petition.  (Pet. Ex.
12, Supreme Court Decision, at 1.)

LEGAL STANDARD

The Ninth Circuit's recent en banc decision in <u>Hayward</u>
governs the scope of federal habeas review of Board decisions
denying parole to California state prisoners.  <u>Hayward</u>, 603 F.3d
at 546.  The court first explained the law in California as it
relates to parole suitability determinations:

> The California parole statute provides that the Board
> of Prison Terms "shall set a release date unless it
> determines that the gravity of the current convicted
> offense or offenses, or the timing and gravity of

United States District Court
For the Northern District of California

> current or past convicted offense or offenses, is
> such that consideration of the public safety requires
> a more lengthy period of incarceration for this
> individual."  The crucial determinant of whether the
> prisoner gets parole in California is "consideration
> of the public safety."
>
> In California, when a prisoner receives an
> indeterminate sentence of fifteen years to life, the
> "indeterminate sentence is in legal effect a sentence
> for the maximum term, subject only to the
> ameliorative power of the [parole authority] to set a
> lesser term."  Under the California parole scheme,
> the prisoner has a right to a parole hearing and
> various procedural guarantees and rights before, at,
> and after the hearing; a right to subsequent hearings
> at set intervals if the Board of Prison Terms turns
> him down for parole; and a right to a written
> explanation if the Governor exercises his authority
> to overturn the Board of Prison Terms' recommendation
> for parole.  Under California law, denial of parole
> must be supported by "some evidence," but review of
> the Governor's decision is "extremely deferential."

Hayward, 603 F.3d at 561-62 (brackets in original) (footnotes

and citations omitted).  The court further explained,

> Subsequent to Hayward's denial of parole, and
> subsequent to our oral argument in this case, the
> California Supreme Court established in two
> decisions, In re Lawrence, [44 Cal. 4th 1181 (2008)]
> and In re Shaputis, [44 Cal. 4th 1241 (2008)] that as
> a matter of state law, "some evidence" of future
> dangerousness is indeed a state sine qua non for
> denial of parole in California. . . .  As a matter of
> California law, "the paramount consideration for both
> the Board and the Governor under the governing
> statutes is whether the inmate currently poses a
> threat to public safety."  There must be "some
> evidence" of such a threat, and an aggravated offense
> "does not, in every case, provide evidence that the
> inmate is a current threat to public safety."  The
> prisoner's aggravated offense does not establish
> current dangerousness "unless the record also
> establishes that something in the prisoner's pre- or
> post-incarceration history, or his or her current
> demeanor and mental state" supports the inference of
> dangerousness.  Thus, in California, the offense of
> conviction may be considered, but the consideration
> must address the determining factor, "a current
> threat to public safety."

Hayward, 603 F.3d at 562 (footnotes and citations omitted).

8

United States District Court
For the Northern District of California

1    After providing this background on California law as it

2    applies to parole suitability determinations, the Ninth Circuit

3    then explained the role of a federal district court charged with

4    reviewing the decision of either the Board or the governor

5    denying a prisoner parole.  According to the Ninth Circuit, the

6    Court must decide whether a decision "rejecting parole was an

7    'unreasonable application' of the California 'some evidence'

8    requirement, or was 'based on an unreasonable determination of

9    the facts in light of the evidence.'"[1]  Hayward, 603 F.3d at

10   562-63 (citations omitted); see also Cooke v. Solis, 606 F.3d

11   1206, 1208 n.2, 1213 (9th Cir. 2010) (applying Hayward and

12   explicitly rejecting the state's argument that "the constraints

13   imposed by [the Antiterrorism and Effective Death Penalty Act

14   (AEDPA)] preclude federal habeas relief" on petitioner's claim;

15   noting that, in Hayward, the court "held that due process

16   challenges to California courts' application of the 'some

17   evidence' requirement are cognizable on federal habeas review

18   under AEDPA").

19                            DISCUSSION

20   I.   California Law Regarding Parole Suitability Determinations

21        When assessing whether California's parole board's

22   suitability determination was supported by "some evidence," this

23

24        [1]  Applying this standard to the facts presented in Hayward,
25   the court concluded that the state court's decision finding there
     was "'some evidence' of Hayward's future dangerousness because of
26   'the nature of the commitment offense' and 'the somewhat
     unfavorable psychological and counsel reports,'" one of which noted
27   that Hayward "would pose a 'low' to 'moderate' risk of danger if
     released, as opposed to 'no' or merely 'low' risk," was not
28   unreasonable and therefore did not warrant federal habeas relief.
     Hayward, 603 F.3d at 563.

United States District Court
For the Northern District of California

Court's analysis is framed by the "regulatory, statutory and constitutional provisions that govern parole decisions in California." Cooke, 606 F.3d at 1213 (citing In re Rosenkrantz, 29 Cal. 4th 616 (2002)); see Hayward, 603 F.3d at 561-62. Under California law, prisoners serving indeterminate life sentences, like Petitioner, become eligible for parole after serving minimum terms of confinement required by statute. In re Dannenberg, 34 Cal. 4th 1061, 1069-70 (2005). At that point, California's parole scheme provides that the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." Cal. Penal Code § 3041(b). Regardless of the length of time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a).

In making this determination, the Board must consider various factors, including the prisoner's social history; past and present mental state; past criminal history; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; and any other information that bears on the prisoner's suitability for release. See id. § 2402(b)-(d).

In considering the commitment offense, the Board must determine whether "the prisoner committed the offense in an

especially heinous, atrocious or cruel manner."   Id.

§ 2402(c)(1).  The factors to be considered in making that

determination include:

> (A) Multiple victims were attacked, injured or killed
> in the same or separate incidents; (B) The offense
> was carried out in a dispassionate and calculated
> manner, such as an execution-style murder; (C) The
> victim was abused, defiled or mutilated during or
> after the offense; (D) The offense was carried out in
> a manner which demonstrates an exceptionally callous
> disregard for human suffering; (E) The motive for the
> crime is inexplicable or very trivial in relation to
> the offense.

Id.  Other circumstances tending to show unsuitability for

parole are a previous record of violence, an unstable social

history, previous sadistic sexual offenses, a history of severe

mental health problems related to the offense and serious

misconduct in prison or jail.   Id.

Circumstances tending to support a finding of suitability

for parole include a lack of a juvenile record, a stable social

history, signs of remorse, that the crime was committed as a

result of significant stress in the prisoner's life, a lack of

criminal history, a reduced possibility of recidivism due to the

prisoner's present age, that the prisoner has made realistic

plans for release or has developed marketable skills that can be

put to use upon release and that the prisoner's institutional

activities indicate an enhanced ability to function within the

law upon release.   Id. § 2402(d).  The California Supreme Court

stated that due process is denied when "an inquiry focuse[s]

only upon the existence of unsuitability factors."   Lawrence, 44

Cal. 4th at 1208.  In Lawrence, the court reiterated "our

conclusion that current dangerousness (rather than the mere

11

presence of a statutory unsuitability factor) is the focus of the parole [suitability] decision."   Id. at 1210.

As the Hayward court pointed out, the California Supreme Court has held that "the core statutory determination entrusted to the Board and the Governor [in determining a prisoner's parole suitability] is whether the inmate poses a current threat to public safety . . . ."   Id. at 1191.   Additionally, "the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness."   Id. at 1205.   The court further explained that:

> a parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." . . . These factors are designed to guide an assessment of the inmate's threat to society, if released, and hence could not logically relate to anything but the threat currently posed by the inmate.

Id. at 1205-06 (citations omitted).   The relevant inquiry, therefore, is:

> whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense.   This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.

Shaputis, 44 Cal. 4th at 1254-55.

The "some evidence" of current dangerousness "must have some indicia of reliability."   In re Scott, 119 Cal. App. 4th 871, 899 (2004) (Scott I).   Indeed, "the 'some evidence' test

may be understood as meaning that suitability determinations must have some rational basis in fact." <u>In re Scott</u>, 133 Cal. App. 4th 573, 590, n. 6 (2005) (<u>Scott II</u>).

Subsequent to <u>Hayward</u>, the Ninth Circuit issued decisions in <u>Cooke</u> and <u>Pirtle v. California Board of Prison Terms</u>, 2010 WL 2732888 (9th Cir. July 12, 2010), both of which focused on the notion that the "some evidence" of current dangerousness must be reliable.  In <u>Cooke</u>, the court ultimately reversed the district court's denial of Cooke's challenge to the Board's 2002 decision denying him parole, finding that the Board's stated reasons for denying parole did not support the conclusion that Cooke posed a current threat to public safety.  <u>Cooke</u>, 606 F.3d at 1216. Specifically, the court stated:

> [E]ach of the Board's findings . . . lacked any evidentiary basis.  Nothing in the record supports the state court's finding that there was "some evidence" in addition to the circumstances of the commitment offense to support the Board's denial of Petitioner's parole.  The Parole Board's findings were individually and <u>in toto</u> unreasonable because they were without evidentiary support.  When habeas courts review the "some evidence" requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings.  Here, there was no evidence that reasonably supports either the necessary subsidiary findings or the ultimate "some evidence" finding. Accordingly, we hold that the state court decision was "'based on an unreasonable determination of the facts in light of the evidence.'"  <u>Hayward</u>, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(2)).  Cooke is entitled to a writ of habeas corpus.

<u>Id.</u>; <u>see also</u> <u>Pirtle</u>, 2010 WL 2732888 at *8 (affirming the district court's decision to grant habeas relief, concluding, "In sum, there is no evidence in the record to support the Board's finding that Pirtle poses a current threat to public safety.  The Board's stated reasons for the denial of parole

**United States District Court**
For the Northern District of California

13

**United States District Court**
For the Northern District of California

either lacked evidentiary support, had no rational relationship to Pirtle's current dangerousness, or both.").

II.   Analysis of Petitioner's Claims

Petitioner argues that: (1) he was denied due process because the Board relied on factors that are categorically false and possess no indicia of reliability; (2) the Board failed to follow California and federal law because it did not compare his conduct to other instances of the same type of crime and then use its proportionality matrix to determine a parole date; (3) he was denied due process because the Board failed to consider all of the reliable and relevant information; (4) he was denied due process by the Board's use of the commitment offense to predict current dangerousness; and (5) his liberty interest was violated by the arbitrary denial of parole.   The Court considers claims one, three, four and five together as a claim that the Board violated his due process rights when it failed to base its denial of parole on "some evidence" of his current dangerousness.   Claim two is considered separately.

The Board and the state courts identified four principle factors providing "some evidence" that Petitioner would be a danger to society: (1) the commitment offense; (2) his criminal record as a juvenile; (3) his behavior while incarcerated; and (4) his lack of marketable job skills.   The Board also determined that Petitioner's alcoholism constituted "some evidence" of his current dangerousness.

The Board found that Petitioner's motive for the crime was inexplicable because he did not know the victim and it was not clear to the Board if he had been drinking.   (Pet. Ex. 1 at 35-

14

36.)  Petitioner admits that he did not know the victim.[2]  (Pet. at 17.)  He points to evidence in the record indicating that he had been drinking heavily on the night of the commitment offense.  (<u>Id.</u> at 17-19.)  Further, his psychological reports suggest that the motive for the crime was "prolonged exposure to aggravation and stress."  (Pet. Ex. 2 at 8; <u>see</u> Cal. Code Regs. tit. 15, § 2402(d)(4).)  Nevertheless, the record indicates that Petitioner armed himself with a knife for what otherwise would have been a street fight.  (Pet. Ex. 1 at 35.)  The Board's consideration of the commitment offense did not violate Petitioner's federal due process rights.

Even though the Board was justified in considering the commitment offense, the California Supreme Court has expressly rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness." <u>Lawrence</u>, 44 Cal. 4th at 1213.  Indeed, "the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' <u>inevitably</u> supporting the ultimate decision that the inmate remains a threat to public safety." <u>Id.</u> at 1191 (emphasis in original).  Instead, there must be additional evidence that shows the commitment offense to "be predictive of current dangerousness many years after commission of the offense." <u>Shaputis</u>, 44 Cal. 4th at 1255.

The Board determined that Petitioner's juvenile record provided additional evidence of his current dangerousness.

---

    [2] Other parts of the record, however, indicate that the victim and Petitioner were neighbors and had "previously argued with [each other] a number of times."  (Pet. Ex. 2 at 7.)

United States District Court
For the Northern District of California

(Pet. Ex. 1 at 12-13.)  The California Code of Regulations addresses whether the "prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age," as a factor tending to show unsuitability for parole.  Cal. Code Regs. tit. 15, § 2402(c)(2).  Here, none of Petitioner's juvenile offenses involved violence.  (Pet. Ex. 1 at 12-13.)  Therefore, although Petitioner does have a juvenile record, he "does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims," other than the commitment offense itself.  Cal. Code Regs. tit. 15, § 2402(d)(2).  Petitioner's non-violent juvenile record is not "some evidence" of his current dangerousness.  To hold otherwise "would actually violate the parole regulations, which consider a lack of 'any significant history of violent crime' to be an indicator of suitability for parole."  Pirtle, 2010 WL 2732888 at *6 (quoting Cal. Code Regs. tit. 15, § 2402(d)(6)) (emphasis in original).  Further, the Board did not ask Petitioner any questions about the circumstances surrounding the incidents on his juvenile record and failed to link his record to his current level of dangerousness.  (See id. at 12-13, 36.)  The state superior court likewise failed to explain how his juvenile record provided "some evidence" of his current dangerousness, simply citing his "prior criminality" as a factor that weighed against his parole suitability.  (Pet. Ex. 10 at 1.)  Additionally, Petitioner is now forty-one years old, and his juvenile record is an immutable fact that, without more, does not constitute

16

United States District Court
For the Northern District of California

"some evidence" of his current dangerousness.  See Lawrence, 44 Cal. 4th at 1191.

Next, the Board and the state courts considered Petitioner's behavior while incarcerated.  The Board did not appear to have relied on his behavior as "some evidence," noting that "[t]he area of disciplines [sic] is a bright spot" for Petitioner.  (Pet. Ex. 1 at 24.)  Although he has had five CDC-115 disciplinary reports, the Board noted that "none of them are violent, none of them are about weapons." (Id. at 25.) Further, Petitioner's psychological evaluation from 2005 pointed out that neither possessing an unauthorized television set nor failure to cut his hair has any "bearing on this inmate's overall risk factors in a community setting." (Pet. Ex. 2 at 1.)  Nonetheless, the state superior court cited his "misconduct while incarcerated" as "some evidence" of his current dangerousness.  (Pet. Ex. 10 at 1.)

The Court agrees with the Board and the psychologist that Petitioner's conduct while incarcerated is a factor in favor of his parole, not against it.  His disciplinary record stems almost entirely from his failure to cut his hair for religious reasons.  In light of the Supreme Court's decision in Cutter v. Wilkinson, 544 U.S. 709, 720 (2005) (holding that the Religious Land Use and Institutionalized Persons Act "alleviates exceptional government-created burdens on private religious exercise"), the Ninth Circuit has held that the CDCR's refusal to permit a religious exception for Native Americans to its hair grooming policy violates their right to religious freedom. Warsoldier v. Woodford, 418 F.3d 989, 991 (9th Cir. 2005).  The

United States District Court
For the Northern District of California

Board recognized this, noting that "the Supreme Court said that those sort of grooming standards didn't matter anymore" when it decided that the violations "are of no concern to the Panel." (Pet. Ex. 1 at 25, 37.)  For the reasons stated above, the Court finds unreasonable the state superior court's determination that Petitioner's conduct while incarcerated constituted "some evidence" of current dangerousness.

Although the Board correctly discounted Petitioner's CDC-115 disciplinary reports, it did cite his lack of programming as "some evidence" of his current dangerousness.  It concluded that "from all appearances before me today, you appear to be a very -- a very healthy and vibrant sort of person so we have no way of knowing what's -- what's involved in this that you've failed to develop a marketable skill that can be put to use upon your release." (Pet. Ex. 1 at 36-37.)  Petitioner was placed on C-status and prevented from programming from 1998 to 2006 for failing to cut his hair for religious reasons.  (Pet. at 21.) Between 1989 and 1998, prior to being placed on C-status, Petitioner had participated in numerous programing activities. He completed his GED and a certificate in vocational x-ray and participated in AA, a literacy life skills class, a sexually transmitted disease control class and classes on Hepatitis C, tuberculosis and HIV/AIDS.[3]  (Id.)  Petitioner was also on the waiting list for a class on alternatives to violence.  (Id.) His supervisors commended him for his "excellent and above

---

[3]   Petitioner took the disease control class and the classes on Hepatitis C, tuberculosis, and HIV/AIDS after 1998.  From October, 1998 to December, 1999, Petitioner was allowed to participate in limited self-help activities while on C-status. (Id. at 22.)

excellent work" as a culinary porter.  (Pet. Ex. 1 at 30.)  Even while he was on C-status, Petitioner was able to participate in AA and NA programs between 2001 and 2003.  (Id. at 32.)  Then, he was once again excluded from participation.  (Pet. at 21-22.)  He was unable to complete any other educational, programming or self-help activities for the remaining time he was on C-status.  (Id. at 21.)  Following Cutter and Warsoldier, Petitioner was taken off C-status on February 27, 2006 and placed on the assignment list.  (Id.)  He immediately signed up for work waiting lists.  (Id. at 23.)  He was particularly interested in a position with support services or the vocational print shop.  (Pet. at 22.)  However, as of the date he filed the present petition, he has been unsuccessful in receiving a work assignment.  (See id.)  He completed an anger management class called "Cage Your Rage" soon after being taken off C-status.  (Id.)  He did not participate in other programming between February, 2006 and July 31, 2007, the date of the Board hearing, but he remains on waiting lists for several programs.  (See id.)

The Board had the above information available to it at the 2007 parole suitability hearing.  Therefore, the Court finds unavailing the Board's conclusion that it "had no way of knowing" why Petitioner's "programming is very thin."  (Pet. Ex. 1 at 36-37.)  Petitioner did a commendable job participating in programming before he was placed on C-status.  After he was removed from C-status, he attempted to work and program without much success.  (Id.)  It is clear from the record that Petitioner's recent programming has been limited because he was placed on C-status.  Furthermore, Petitioner has been able to

United States District Court
For the Northern District of California

earn a GED and an x-ray certificate in prison and also has pre-incarceration marketable skills in auto mechanics as well as carpet and tile laying. (Pet. Ex. 2 at 5.)  The Court finds unreasonable the Board's and the state superior court's conclusions that Petitioner's failure to program constitutes "some evidence" of his current dangerousness to society.

Petitioner's history of alcohol abuse was raised by the Board; however, the state superior court did not consider it as "some evidence" of his current dangerousness.  (Pet. Ex. 10 at 1.)  Respondent incorrectly claims that Petitioner has not participated in any substance abuse programming.  (Answer at 9.)  As noted above, Petitioner participated in AA prior to and during part of his C-status classification.  (Pet. Ex. 1 at 32.)  After Petitioner informed the Board that he was not currently active in AA but had been in the past, he explained that he thought "a lot of it's [sic] sets you up for failure.  Makes you kind of like rely on other things other than yourself." (Id. at 24.)  Petitioner stated he preferred a program where he had the power to control his activities and, to that end, he regularly attended a Native American sweat lodge at the prison.  (Id.; Answer Ex. 2, Ex. 4, at 17.)  He provided the Board with a letter from Three Rivers Indian Lodge, a Native American alcohol treatment facility that offers AA meetings as well as other alcohol treatment plans.  (Pet. Ex. 1 at 20.)  He indicated that he could utilize their services after his release.  (Id.)  The Board told Petitioner that, although he did not have to attend AA, he should meet two requirements: "demonstrat[e] that you've got an ability to recognize the fact that you were having

United States District Court
For the Northern District of California

problems with alcohol at the time of the commitment offense and
what you would do to use as a relapse prevention program."
(Pet. Ex. 1 at 37.)  Petitioner has met both requirements.

     First, the record indicates that Petitioner recognizes his
alcoholism and its contribution to his past offenses.
Petitioner showed a great deal of insight to the Board and the
psychologist about the role of alcohol in his life.  (Pet. Ex 2
at 5-7.)  Although the Board did not ask him about the
relationship between his alcohol abuse and the commitment
offense, it had psychological reports which indicated that
Petitioner had addressed this issue.  In the 2001 psychological
evaluation, the psychologist reported that Petitioner
"acknowledges that he has abused alcohol in the past.  He
reports that he last used alcohol in 1988, the time of his
incarceration."  (Id. at 5.)  Furthermore, Petitioner clearly
connected his alcohol abuse to the commitment offense,
"insightfully not[ing]" that "alcohol limited his vigilance to
avoid fighting.  He strongly asserted that he intends to never
drink alcohol again.  The inmate seemed genuinely penitent for
his crime and seems to understand the circumstances culminating
in the crime."  (Id. at 7.)  Petitioner recognized his alcohol
addiction and has gained insight into its connection to the
commitment offense.

     Petitioner told the Board, "I don't want to do this again
or be through this again or hurt anybody else because of that so
I have to take it upon myself to make sure I don't do nothing
like this again."  (Pet. Ex. 1 at 27.)  When the Board
characterized his approach as a desire not to return to prison,

United States District Court
For the Northern District of California

1  Petitioner emphasized, "And I don't want to hurt anybody else
2  either." (<u>Id.</u>)

3      Second, Petitioner has created a feasible relapse
4  prevention program.  Since being taken off C-status, Petitioner
5  has chosen not to return to AA but, instead, has taken the
6  things he learned in AA and applied them to his life.  (<u>See</u> Pet.
7  Ex. 1 at 27.)  If the Board had concerns about Petitioner's
8  relapse prevention plan, it could have questioned him further;
9  instead, the Board turned to another subject.  (<u>See</u> <u>id.</u>)

10     The Board also failed to take into account Petitioner's
11 use of the sweat lodge while incarcerated and his letter from
12 Three Rivers Indian Lodge, a facility that may fit Petitioner's
13 needs better than AA.  (<u>Id.</u> at 20, 37.)  The Ninth Circuit's
14 recent decision in <u>Pirtle</u> found that a petitioner who objected
15 to AA's "emphasis on a higher power" could not be denied parole
16 for failing to attend AA when no secular programming was
17 available.  <u>Pirtle</u>, 2010 WL 2732888 at *6.  The court concluded
18 that the petitioner's "failure to attend a program that is not
19 available has no probative value, and thus cannot support the
20 Board's decision in any way."  <u>Id.</u>  Like Pirtle, Petitioner
21 provided the Board with a program he could participate in if he
22 were released.  (Pet. Ex. 1 at 20.)

23     Petitioner has not consumed any alcohol since his
24 incarceration in 1988 and has been sober for twenty-two years.
25 (<u>Id.</u> at 7.)  There is therefore no evidence that Petitioner will
26 be unable or unwilling to manage his alcohol problem effectively
27 upon release, as he has already done for more than two decades.
28 The record does not support the Board's determination that

United States District Court
For the Northern District of California

1   Petitioner's history of alcohol abuse constitutes "some

2   evidence" of his current dangerousness.

3        The remaining factors discussed in the California Code of

4   Regulations weigh in Petitioner's favor.  See Cal. Code Regs.

5   tit. 15, § 2402(d).  As discussed above, Petitioner's

6   institutional behavior, lack of violent criminal history and

7   signs of remorse all count in favor of his parole.  Id.,

8   § 2402(d)(1), (3), (6), (9).  Additionally, Petitioner appears

9   to have a stable social history.  Id., § 2402(d)(2).  He

10  maintains a close relationship with his family, especially his

11  parents, and has also remained connected with friends.  (Pet.

12  Ex. 1 at 17-20.)

13       Furthermore, Petitioner has "made realistic plans for

14  release."  Cal. Code Regs. tit. 15, § 2402(d)(8).  The Board

15  noted Petitioner's parole plans with approval.  (Pet. Ex. 1 at

16  38.)  He will live with his parents in Stockton or with his

17  friend, Curtis Riggins.  (Id. at 19.)  Mr. Riggins, who owns and

18  operates Curtis Custom Tile Marble Gallery, has given Petitioner

19  a firm offer of employment.  (Id.)  Petitioner's parole plans

20  weigh in favor of his parole suitability and do not provide

21  "some evidence" of current dangerousness to society.

22       Finally, no other factors weigh against Petitioner's

23  parole.  Petitioner has no record of sadistic sexual offenses

24  and there are no psychological factors or mental health problems

25  that could provide "some evidence" of his current dangerousness.

26  § 2402(c)(4), (5).  Indeed, his psychological reports are

27  overwhelmingly positive.  In the 2005 report, Dr. E. W. Hewchuk

28  emphasizes that Petitioner "remains genuinely remorseful for his

23

United States District Court
For the Northern District of California

part in the tragic loss of human life, and his lengthy prison record is a reflection of both compliance and a motivation to change." (Pet. Ex. 2 at 1.) Dr. Hewchuk agreed with Petitioner's 2001 psychological report that he poses "no greater risk of reoffending than the average citizen." (<u>Id.</u> at 1, 8.)

The Court therefore concludes that the Board's and the state courts' determinations that Petitioner's commitment offense, prior criminality, misconduct while incarcerated and failure to program constituted "some evidence" of unsuitability was an "unreasonable application" of the California "some evidence" requirement, and was "based on an unreasonable determination of the facts in light of the evidence." <u>Hayward</u>, 603 F.3d at 562–63 (citations omitted); <u>see also</u> <u>Cooke</u>, 606 F.3d at 1216; <u>Pirtle</u>, 2010 WL 2732888 at *8. As a result, Petitioner is entitled to federal habeas relief on his due process claim.

Petitioner also raises an alternate due process claim for habeas relief relating to the Board's sentencing matrix. Petitioner claims his due process rights were violated because he is overdue for release pursuant to the Board's sentencing matrix. Petitioner argues that his commitment offense was not especially egregious compared to other second degree murders. He claims that he has met the maximum sentence prescribed by the sentencing matrix. (Pet. at 33.)

Petitioner misinterprets the matrix. He is serving an indeterminate sentence under California Penal Code § 1168. When a prisoner is sentenced under § 1168, the Board determines whether the prisoner is suitable for parole. Cal. Penal Code § 3040(b). If the prisoner is found suitable, the Board will

set a release date after consulting the matrix.  However, the matrix need not be consulted if the Board finds a prisoner to be unsuitable for parole.  <u>Dannenberg</u>, 34 Cal. 4th at 1071 (citing Cal. Penal Code § 3041).

Here, the Board found Petitioner to be unsuitable for parole.  Accordingly, it was not required to consult the matrix or calculate good time credits.  Petitioner's due process claim relating to the Board's sentencing matrix is therefore DENIED.

CONCLUSION

For the foregoing reasons, the Court GRANTS the Petition for a Writ of Habeas Corpus.  Within <u>thirty (30) days</u> from the date of this Order, the Board must set a parole date for Petitioner unless it finds new evidence, arising after his most recent hearing in 2008, of current dangerousness.  Within <u>thirty (30) days</u>, Respondent must file a notice with the Court confirming the parole date.  Within <u>seven (7) days</u> after the parole date, Respondent must file a notice with the Court indicating whether Petitioner has been released on parole.  The Court retains jurisdiction to enforce its order.

The Clerk of the Court shall terminate all pending motions, enter judgment and close the file.  Each party shall bear his own costs.

IT IS SO ORDERED.

Dated: 8/27/2010

_____
CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

NEVILLE PORRAS,                                    Case Number: CV08-05252 CW

**CERTIFICATE OF SERVICE**

     Plaintiff,

  v.

BEN CURRY et al,

     Defendant.

_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 27, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Neville  Porras E-37606
P.O. Box 689
YW-337
Soledad,  CA 93960-0689

Dated:  August 27, 2010

                                 Richard W. Wieking, Clerk
                                 By:  Nikki Riley, Deputy Clerk

**United States District Court**
For the Northern District of California